# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREENWICH INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 12-291 |
| v. | ) ) | Judge Cathy Bissoon |
| BBU SERVICES, INC., *et al.*, | ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

### **I. MEMORANDUM**

For the reasons that follow, BBU's Motion for Summary Judgment (Doc. 106) will be denied, Greenwich's Motion for Summary Judgment (Doc. 111) regarding its affirmative claims will be denied, and Greenwich's Motion for Summary Judgment (Doc. 114) regarding BBU's Counterclaims will be granted in part and denied in part. Specifically, questions of fact remain regarding BBU's bad faith claims, but BBU cannot recover punitive damages or consequential damages based on generalized harms to its business operations.

### **BACKGROUND**

The parties are well acquainted with the facts, and the Court will summarize them only for the purpose of context. Greenwich issued CGL and excess/umbrella policies to BBU, and Chesapeake was named as an additional insured. *See generally* Compl. (Doc. 1). Greenwich has brought this action, in diversity, seeking a judicial declaration that it owes no duty of coverage to BBU or Chesapeake for injuries sustained by the Lancasters in

February 2011, said injuries having been litigated in West Virginia state court.[1] The Lancasters were employees of BBU, and, in April 2011, they brought a state court action against Chesapeake, only, in light of the workers compensation bar. *See* compl. in state court (filed under Doc. 110-2) at ¶ 7 (alleging tort-based claims against Chesapeake, and acknowledging that Lancasters "were [acting] in the scope of their employment with BBU").

Under a master service agreement ("MSA") between BBU and Chesapeake, BBU owed a contractual duty of indemnification to Chesapeake. Chesapeake notified BBU of the potential Lancaster claims, and BBU forwarded them to Greenwich for defense and coverage. *See* Defs.' Facts (Doc. 110) at ¶¶ 10, 23 & 24.[2] In May 2011, Greenwich accepted the Chesapeake tender and informed Defendants that it would not invoke a reservation of rights. *See id.* at ¶ 56.

Five months later, in October 2011, Greenwich changed its position and issued a reservation of rights letter (although Greenwich agreed to continue Chesapeake's defense in the state action). *See* Ltr. (filed under Doc. 110-3 at pgs. 107-137 of 159). Among other things, Greenwich took the position that the Lancasters' injuries "were not caused, in whole or in part, by BBU's actions or omissions," as purportedly required under the policy definitions of "insured contract" and "additional insured." *Id.* at pgs. 133-134 of 159; *see also* Defs.' Facts (Doc. 110) at ¶ 89.

At the time Greenwich issued its reservation of rights letter in October 2011, BBU was not a party to the underlying litigation. BBU was not joined into the litigation until October 2012, when Chesapeake brought a third-party claim against BBU alleging negligence. *See* 3d p. compl. in state action (filed under Doc. 110-4 at pgs. 64-68 of 186). In the interim, little of

---

[1] The involvement of Defendants Signal and H&H have no bearing on the Court's analyses and, therefore, those entities are omitted from the Court's discussion.
[2] To the extent that the parties' statements of fact are referenced herein, the Court has concluded that any disputes regarding them are immaterial for the purposes of its rulings.

substance transpired in the state court proceedings, as the parties awaited the state court's ruling on a forum *non conveniens* motion that had been filed by Chesapeake. *See* Greenwich's Facts (Doc. 116) at ¶¶ 47-52 *and* Defs.' Resps. (Doc. 130) (admitting same).

Shortly after BBU was named as a third-party defendant, Greenwich agreed to defend BBU in the state action, pursuant to a reservation of rights. *See* Doc. 110-4 at pgs. 175-185 of 186. According to BBU, Greenwich's reservation letter asserted that there were discrepancies between Chesapeake's address in the policy documents and the location of the accident, that BBU was not negligent, and that the MSA's indemnification provisions violated controlling state law. *See* BBU's Countercl. at ¶ 31. In connection with the third-party claims, Greenwich agreed to retain BBU's law firm of choice, Huddleston & Bolen, for its defense. *See* Greenwich's Facts (Doc. 116) at ¶ 85; *see also* Greenwich's Resp. (Doc. 141) to Defs.' Facts at ¶ 33.

Around March 2013, approximately five months after BBU was joined in the underlying state action, the lawsuit settled. Chesapeake paid the full amount of the settlement, and the case was dismissed with prejudice. *See* Greenwich's Facts (Doc. 116) at ¶¶ 86-87.

Greenwich filed the instant declaratory judgment action in March 2012, and the parties have vigorously litigated coverage issues while the state court action proceeded to resolution. In addition to the coverage issues, BBU has filed Counterclaims for breach of contract and bad faith, relying, in large part, on Greenwich's change of position regarding whether Chesapeake's defense was offered with or without a reservation of rights. BBU seeks damages in the form of attorneys' fees and costs in connection with this lawsuit, the underlying state case and in a tangentially related state-court action against the insurance agency that secured the Greenwich policies. *See* BBU's Countercl. at Count I. BBU further claims prospective damages flowing

3

from its duty to indemnify Chesapeake under the MSA, in the absence of coverage. *See id.* Finally, BBU alleges bad faith and it seeks consequential and punitive damages. *See id.* at Count II.

This case proceeded to summary judgment, and all of the parties cross-filed motions based on their respective positions. Before the Court was able to decide the Motions, however, the parties filed a joint stipulation of dismissal, with prejudice, eliminating all claims in this lawsuit save the ones between Greenwich and BBU. *See* Doc. 143. To be clear, *all* other claims have been extinguished, including any potential claims of indemnification asserted by Chesapeake against BBU. *See id.* (Chesapeake "hereby dismiss[es] with prejudice all claims that have been asserted, or could have been asserted by them in this action, whether by claim, counterclaim or cross claim, against BBU").

These events, by necessity, have narrowed the scope of the litigation remaining before the Court. A sizable piece of BBU's putative harms, namely, its duty to indemnify the other Defendants in the absence of coverage, no longer is at issue.

In any event, if the Court concludes that Greenwich owed no duty of coverage (and otherwise did not act in bad faith), this ends the inquiry and BBU may enjoy no further relief. If, on the other hand, the Court finds that coverage to Chesapeake or BBU may attach, BBU can proceed against Greenwich on its Counterclaims, presumably to recoup compensatory and punitive damages under the rubric of bad faith.

For the reasons stated below, the Court concludes that Greenwich is not entitled to summary judgment on its declaratory judgment claims. Thus, BBU is able to proceed on its Counterclaims, but the Court disagrees that BBU is entitled to summary judgment regarding bad faith. The Court also determines that BBU's claims for punitive damages fail to satisfy the

4

governing legal standards, and those claims will not be submitted to a jury. Finally, the Court determines, as a matter of law, that BBU's damages theory based on generalized harms to its business operations are too attenuated and speculative to support recovery.[3]

**ANALYSIS**

    **A. Coverage**

Although the parties' legal arguments take many forms, they circle back to a fundamental question: whether or not the policies preclude coverage because the underlying suit did not (in the first instance) allege negligence on behalf of BBU. This question arises from policy language requiring that bodily injury be "caused, in whole or in part," by the named insured, BBU. Greenwich's other argument, that it owes no coverage based on Chesapeake's status as an "additional insured" is, in essence, the flipside of the same coin, as Ohio law would disallow coverage for claims founded exclusively on Chesapeake's "own negligence." *See* Greenwich's Opp'n Br. (Doc. 134) at 5-6 (citing legal authority).[4]

Much of the confusion in this area stems from the fact that Greenwich's policies are unclear regarding how the relevant provisions should be applied in cases like this one, where the workers compensation bar would *preclude* claims by the injured employee against BBU. The cases cited in the parties' briefs are unsatisfying, and the Court's independent research has failed to uncover Ohio caselaw addressing the issue.[5] Thus, the Court will turn to persuasive authority.

---

[3] As the parties are aware, claims for declaratory judgment regarding insurance coverage pose questions of law for the Court, and claims of bad faith, typically, are for the jury.
[4] The parties agree that Ohio law controls.
[5] The statements in Greenwich's most facially-apposite decision, Cuyahoga County v. State Auto, were made in *dicta*, and, far more importantly, that decision did not grapple with the issues

The most lucid explanation the Court has found is contained in a treatise:

In December 2003, the Insurance Services Office, Inc. ('ISO') introduced revised versions of the most widely written standard form additional insured endorsements, including [a form] often used by contractors to acquire additional insured status. The 2004 revisions . . . eliminated the 'arising out of' language . . . [and] substituted, in its stead, that coverage applied only to injury or damage 'caused in whole or in part' by the acts omissions of the named insured . . . .

The 2004 revisions are a belated acknowledgement that the 'arising out of' language simply did not accomplish the scope of coverage intended by the industry. Many courts interpreted 'arising out of' to be a simple causation test and, therefore, afforded direct primary coverage to the additional insured. . . . The ISO hope[d] that, by substituting 'caused by' for 'arising out of,' a narrower coverage interpretation will be afforded. . . . Arguably, the absence of fault on behalf of the named insured [will] result[] in a finding of no coverage for the additional insured. . . .

An area of concern to many risk management professionals is how insurers will apply the new endorsement to third-party over actions. These involve actions by injured employees of named insureds, such as subcontractors, against additional insureds, such as contractors and owners. These actions are quite common in many states, often alleging failure to maintain a safe workplace, and a general contractor with additional insured status in the subcontractor's CGL policy has historically been covered for these claims. <u>Since the employee is barred by the workers' compensation statute from bringing a suit against his own employer, these suits will generally not mention the employer, alleging only negligence against the general contractor additional insured. The concern is that, since the suit does not allege any degree of fault against the named insured employer, CGL insurers will take the position that the employee's injuries were not 'caused, in whole or in part, by' the . . . . named insured</u> . . . .

<u>Of course, the subcontractor usually will have been partially at fault, even though the suit does not contain allegations against it</u>. State laws vary on the obligation they place on insurers to look beyond the allegations of a suit in determining whether a duty to defend exists. <u>The only allegations that would fall clearly outside the coverage provisions of the new additional insured endorsements, however, would be explicit allegations of the additional insured's sole fault</u>.

<u>In most instances, insurers should look beyond the lawsuit to determine if the insured's acts or omissions may have contributed to the bodily injury, and whether they should defend and indemnify on behalf of the additional insured</u>.

---

presented by the workers compensation bar. *See id.*, 2012 WL 5304083, *3 (N.D. Oh. Oct. 25, 2012).

**A hard-line approach on this by insurers will likely result in a new line of coverage cases in which additional insureds are attempting to prove some degree of culpability against their subcontractors to obtain coverage under the subcontractors' CGL policies**.

4 BRUNER & O'CONNOR CONSTRUCTION LAW § 11:167, available under Westlaw "find" citation "BOCL § 11:167" (updated July 2014) (emphases added).

These observations seem prophetic, as the commentators' predictions regarding what would result from a "hard-line" approach did, in fact, come to pass here. *Compare* discussion *supra* (discussing Chesapeake's third-party claims against BBU in underlying action, which Greenwich then agreed to defend) *with* language quoted immediately above (contemplating "a new line of coverage cases in which additional insureds are attempting to prove some degree of culpability against their subcontractors to obtain coverage"). The question that remains, however, is how the Court should interpret the language under the circumstances presented.

There are two decisions that best forecast the potential outcomes in this case, those in Gilbane v. Empire Steel (S.D. Tex.) and in Ramara v. Westfield (E.D. Pa.). In Gilbane, the district court cited the Texas comparative negligence/responsibility statute to conclude that the injured employee's own negligence (and thereby the employer's) was "always at issue, even in the absence of . . . pleading[s] to that effect." *Id.*, 691 F. Supp.2d 712, 721 (2010). The district court further cited with approval caselaw recognizing that an insurer's arguments for non-coverage "ignore[ the named insured's] inchoate immunity under the Worker's Compensation Act to a suit by its employee. . . . In other words, a petition that does not, and cannot, state allegations of negligence against the employer does not indicate that the employer was not at fault, only that it is statutorily immune from suit." *Id.* at 723-24 (citation to

quoted source omitted, emphasis added, alterations in original). On these grounds, the district court found that the insurer owed a duty of coverage. *See id.*

The Court of Appeals for the Fifth Circuit reversed, applying the "eight corners rule" as interpreted under Texas law. *See id.*, 664 F.3d 589, 596-97 (2011). That rule restricted Texas courts to considering only the policy language and the facts alleged in the underlying case. *See id.*[6] The court declined to make an exception to the eight-corners rule based on the workers compensation scenario, noting that workers compensation was not pleaded in the underlying case. *See id.* at 600-601. In essence, the circuit court found itself constrained by the hard-line approach of the Texas state courts, which, in this Court's view, is reminiscent of the seemingly nettlesome "hard-line" approach of denying coverage in the first place. *See* discussion *supra* (opining that "[t]he only allegations that would fall clearly outside the coverage provisions . . . would be explicit allegations of the additional insured's *sole fault*"; recommending that insurers "look beyond the [underlying pleadings] to determine if the insured's acts or omissions may have contributed"; and cautioning that "[a] hard-line approach on this by insurers will likely result in a new line of coverage cases") (emphasis added).

In apparent recognition of the harshness of its result, the circuit court acknowledged that Texas's strict interpretation "present[ed] a seemingly difficult hurdle for additional insureds to trigger coverage while navigating difficult workers' compensation and contributory negligence issues." *See id.* at 601 n.3. Nevertheless, the court declined to "create exceptions where the Texas Supreme Court has not shown that it would." *Id.* As some measure of solace, the court suggested that these issues may be circumvented through the parties to the underlying suit

---

[6] Notably, the instant case is distinguishable from Gilbane because, in the end, BBU was brought within the "eight corners" once Chesapeake named BBU as a third-party defendant.

8

"amend[ing] their pleadings," presumably to add the workers compensation-barred employer, "to trigger coverage on the verge of settlement." *See id.*[7]

Unconstrained by the hard-line rules in Texas, the court in Ramara v. Westfield came to a different conclusion:

> [The insurer's] position ignores the realities of the worksite, the corresponding public policy that creates employer immunity, and the realities of construction injury litigation. Defendants do not dispute that [the insured] employed [the injured] at the time of his injury or even seriously challenge [the additional insured's] assumption that it would be covered for this type of accident. [The insurer's] narrow analysis of the legal issues ignores the effect of the Pennsylvania Workers' Compensation Act, which prevents [the injured] from naming his employer as a defendant in the underlying suit.
>
> The purpose behind [Pennsylvania's four corners rule] is that an insurer should not be required to defend a claim when it is apparent on the face of the complaint that none of the injuries fall within the purview of the insurance policy. Given the circumstances of this case, that purpose would not be well served by blindly following [an insurer's] insistence that the [c]ourt apply the most restrictive interpretation . . . . Due to the immunity conferred by the Workmens Compensation Act, [the injured] could not have sued his employer . . ., and, thus, would not have included any allegations about [the employer] in his underlying complaint. Nonetheless, [the insurer] has expressly stipulated that it knew [the victim] was injured while performing duties on a job site in the scope of his employment . . . . Given [the insurer's] obvious knowledge of the existence of facts that could trigger coverage and its awareness of [the injured's] reason for not including them, <u>it would be both illogical and unjust for this [c]ourt to find that [a] duty [of coverage] was not triggered</u>.
>
> The purpose of the . . . Workers' Compensation Act is clear: it limits an employer's tort exposure and grants employees a statutory remedy for all work related injuries. . . . Given that workers' compensation benefits represent a compromise -- automatic coverage regardless of fault in return for medical coverage and partial wage replacement -- it is not surprising that injured workers seek a fuller measure of compensation from non-immune parties. In turn, it is not surprising that third parties potentially subject to claims arising out of construction demand coverage from the contractors they hire. [The additional insured's] request that it be protected as an additional insured under [the] policy comports with the normal conventions of construction contracts.

---

[7] Chesapeake's assertion of third-party claims against BBU would appear to be the functional equivalent of the safety-valve suggested in Gilbane. On some level, this observation begs the question, why is this Court still adjudicating coverage issues in this case?

9

> [T]he parties' reasonable expectations are to be the touchstone of any inquiry into the meaning of an insurance policy. . . . Although the language of the policy normally provides the best indication of the parties' reasonable expectations . . . ., the totality of the insurance transaction must be examined . . . . This case involves precisely the type of lengthy, complex, and cumbersomely written documents contemplated by [the] caselaw in urging courts to safeguard the purchasing public's reasonable expectations. . . .
>
> The specific inclusion of . . . [the] additional insured on [the] policy . . . strongly favor[s] the conclusion that coverage exists. The totality of the transaction makes clear that [the additional insured] intended to seek coverage for the type of injury suffered by [the injured] . . . . If [the court] were to hold that the injuries suffered by . . . subcontractor[] employees -- physically present and working at its [location] during the course of the insured project -- did not in fact fall within the scope of the additional insured coverage, then [the] reasonable expectation of insurance coverage would be entirely defeated. <u>No purpose is served by drawing a narrow line to defeat . . . coverage merely because [the employer] could not [by operation of workers compensation law] be named as a defendant in [the injured's] complaint. Such an absurd result could only create bad policy and muddled caselaw</u>.

<u>Ramara, Inc. v. Westfield Ins. Co.</u>, 2014 WL 6676712, *8-10 (E.D. Pa. Nov. 24, 2014) (citation to quoted sources omitted, emphasis added, some alterations in original).

The rules of interpretation applied above are consistent with those in Ohio, and the Court agrees with <u>Ramara</u>, and finds it applicable, in all material respects. Furthermore, Chesapeake's joinder of BBU into the underlying case, and its assertion of negligence against it, distinguishes this case from both <u>Gilbane</u> and <u>Ramara</u>, and it makes Greenwich's continuing resistance to coverage even less tenable. For all of these reasons, Greenwich's Motion for Summary Judgment regarding coverage will be denied.

### B. **Bad Faith**

Given that Greenwich and Chesapeake have, by now, settled the coverage dispute, and that Chesapeake and the other Defendants have dismissed with prejudice any claims against BBU, the bulk of the parties' original disputes now are moot. It appears, however, that BBU

10

does not feel that it has been "made whole" by recent events, and the Court must evaluate its remaining claims.

At the onset, the Court finds that BBU has identified sufficient material facts to present a triable claim of bad faith against Greenwich, both with respect to its handling of the Chesapeake tender, and, potentially, with its handling of the third-party claims against BBU. *See generally* BBU's Countercls. *and* Defs.' Facts (Doc. 11) (identifying material, disputed facts pertaining to Greenwich's shifting positions regarding coverage, changes in claim-handling personnel and invocation of arguably questionable grounds for denial). Based on the evidence so-far presented, a jury reasonably could perceive Greenwich's coverage positions as evincing a "shifting sands" scenario, through which Greenwich attempted to deny coverage through all available means. *See id.* (reciting allegations and evidence that Greenwich reversed course regarding reservation of rights, resisted coverage based on CGL's pollution exclusion, despite existence of separate pollution policy, and reserved rights based on address discrepancies that could have been rectified through Greenwich's own documents).[8]

Greenwich argues that bad faith claims are unavailable because its coverage positions were "fairly debatable." *See* Greenwich's Br. (Doc. 115) at 8-12. While the Court agrees that coverage issues regarding the "caused, in whole or in part" provisions were, indeed, debatable,

---

[8] Much has been made of Greenwich's shift in position regarding its reservation of rights, and the Court finds unpersuasive Greenwich's arguments that it did not, in fact, change positions. These arguments relate most directly to BBU's assertion that Greenwich is estopped from, or has waived, a denial of coverage. The Court need not address waiver and estoppel, however, given that Greenwich's Motion for Summary Judgment regarding coverage will be denied. The Court does note, however, that BBU's claims of prejudice based on Greenwich's reversal ring hollow. During the five months between Greenwich's unreserved acceptance of Chesapeake's tender and its issuance of the reservation letter, nothing of substance occurred in the underlying litigation, and BBU was not yet even a party to it. Any prejudice to BBU, under the circumstances discussed above and below, would be both conjectural and speculative. Nevertheless, the Court does believe that evidence regarding Greenwich's reversal would be admissible to support a pattern of bad faith, more generally, or at the very least as background.

*see* discussion *supra*, Greenwich has failed to show that its other positions likewise were insulated. Furthermore, Greenwich's reading of the bad faith standards is too restrictive, as claims may extend to conduct beyond the coverage decision. *See* Jay v. Massachusetts Cas. Ins. Co., 2008 WL 555440, *12 (Oh. App. Feb. 27, 2008) ("[t]he duty of good faith extends beyond those scenarios involving an outright denial of payment for a claim," and, even where claim ultimately is paid, "the insurer's foot-dragging in the claims-handling and evaluation process [may] support a bad-faith cause of action") (citation to quoted sources omitted).

The Court finds triable jury issues regarding BBU's bad faith claims, but it does not agree with BBU that it has shown entitlement to an affirmative entry of summary judgment. Greenwich has identified numerous issues of material, disputed fact, and it should be permitted to tell its side of the story. These things being said, BBU has *not* presented sufficient evidence to submit a punitive damages claim, and its business operations theory is too speculative.

To be awarded punitive damages, BBU would be required to show "malice or aggravated or egregious fraud." Jenkins v. State Farm Mut. Auto. Ins. Co., 2013 WL 1200246, *9 (Oh. App. Mar. 26, 2013) (citation omitted). None of BBU's allegations reasonably can be viewed as rising to this standard. While there is enough evidence to support BBU's theory that Greenwich acted unreasonably based on a general desire to avoid coverage, nothing in BBU's submissions creates a reasonable inference of malice, or aggravated or egregious fraud. To the extent that Greenwich's Motion for Summary Judgment relates to BBU's claim for punitive damages, it will be granted.

Also insufficient is BBU's theory of damages regarding perceived harms to its business operations. BBU has expressed its intention to seek damages based on what it would have done, from a business perspective, had it known that Greenwich would resist coverage. BBU's theory

boils down to the assertion that, had Greenwich not reversed its position regarding a reservation of rights, after five months of substantive inactivity in the underlying suit, BBU "would have set aside a defense fund and would not have continued making substantial capital investments [in] support [of] its work for Chesapeake." BBU's Br. (Doc. 107) at 12. BBU has retained experts in support of this theory. *See* Doc. 95 at 6 (quoting expert report opining that, "[b]ut for [Greenwich's] refusal to provide [coverage], Chesapeake would have continued using BBU as a vendor and its demand for BBU's services would not have declined"); *see also* Doc. 95-3 (portions under seal) (opining that business losses to BBU exceeded $10 million).

"[A]n insurer who acts in bad faith is liable for those compensatory damages <u>flowing from the bad faith conduct</u> of the insurer and <u>caused by</u> the insurer's breach of contract." Zoppo v. Homestead Ins. Co., 644 N.E.2d 397, 402 (Oh. 1994) (emphasis added). As in any other context, consequential damages for bad faith cannot be speculative. *See* Beever v. Cincinnati Life Ins. Co., 2003 WL 21321428, *10-11 (Oh. App. Jun. 10, 2003) (citation omitted) (rejecting theory of damages based on lost investment opportunity). Consequential damages likewise invite scrutiny under the doctrines of proximate cause, foreseeability, mitigation and remoteness. *See generally* Telxon Corp. v. Smart Media of Delaware, Inc., 2005 WL 2292800, *36-37 (Oh. App. Sept. 21, 2005).

In this case, there is insufficient evidence for a jury reasonably to conclude that Greenwich's alleged bad faith conduct proximately caused damages to BBU in excess of $10 million. BBU was not named as a party to the underlying litigation until October 2012, at which time Greenwich promptly appointed defense counsel of BBU's choice. BBU's claims focus on the five-month period between Greenwich's non-reservation of rights, in May of 2011, and its reversal of position in October 2011. Nothing of substance occurred in the underlying lawsuit

13

during that period, and Greenwich, at all times, provided legal defenses to both Chesapeake and BBU. Approximately six months after BBU was joined in the underlying suit, the case settled, with Chesapeake paying all of the settlement funds.

Under the circumstances presented, it would be patently unreasonable to lay at the feet of Greenwich all of the alleged business consequences purportedly suffered by BBU. *Cf., e.g.,* Med. Protective Co. v. Fragatos, 940 N.E.2d 1011, 1015 (Oh. App. 2010) (to determine whether prejudice resulted from change in reservation of rights, court should consider "[t]he loss of a favorable settlement opportunity, inability to produce all testimony . . ., inability to produce favorable witnesses, loss of benefit of any defense in law or fact through reliance upon the insurer's promise to defend, or withdrawal [on eve of trial]") (citation to quoted source omitted).[9]

It would be altogether unsurprising that adverse consequences may have resulted from the horrible accident that befell BBU's injured employees. It would be wholly speculative and conjectural, however, to conclude that Greenwich's purported misconduct proximately caused any and all of the adverse business consequences flowing therefrom.[10] BBU's musings regarding the establishment of a "defense fund" or of making different capital-investment decisions based on Greenwich's coverage positions require conjecture and speculation, and it would be equally conjectural and speculative to conclude that, absent Greenwich's alleged

---

[9] BBU's damages theory goes well beyond anything this Court has seen in the caselaw, and if supportive authority exists, BBU has failed to identify it. In addition to speculation, these issues serve to demonstrate a significant, if not fatal, problem of remoteness.

[10] Notably, Greenwich has presented competent evidence indicating that the business relationship between Chesapeake and BBU began deteriorating *before* Greenwich issued its reservation of rights letter. *See* Greenwich's Opp'n Br. (Doc. 134) at 15-16 (summarizing evidence regarding, among other things, departure of BBU manager and employees, to work for competitor, and BBU's initiation of state court action in September 2012, alleging that former employees conspired to divert Chesapeake's business away from BBU). Although the Court declines to rely on this evidence for the purpose of granting summary judgment, it is just one of the many potential alternative explanations for BBU's business difficulties.

misconduct, the results, in the underlying litigation or otherwise, would have been any different. Furthermore, it would be unreasonable to conclude that the damages BBU now seeks were in any way foreseeable to Greenwich, who now faces a damages claim several multitudes greater than its potential exposure on the underlying claims.

In sum, BBU demands too much of its damages claims commensurate with its allegations of bad faith. The purpose of this lawsuit is not to insulate BBU from all harms potentially visited upon it through the vagaries of operating a business. Rather, its purpose has been, and remains, to determine whether Greenwich had good reason to resist coverage, and, if not, any harms *reasonably* flowing from bad faith conduct. BBU's damages theory does not qualify, and, for all of the reasons stated above, the Court hereby enters the following:

## II. **ORDER**

BBU's Motion for Summary Judgment (**Doc. 106**) is **DENIED**; Greenwich's Motion for Summary Judgment (**Doc. 111**) is **DENIED**; Greenwich's Motion for Summary Judgment (**Doc. 114**) on BBU's Counterclaims is **DENIED** regarding BBU's pursuit of bad faith claims, generally; but the Motion is **GRANTED** regarding BBU's claims for punitive and consequential damages, to the extent described above.

IT IS FURTHER ORDERED that the Court will conduct a Status/Settlement Conference on **January 15, 2015 at 1:30 p.m.**, to discuss how this case will proceed. Counsel shall bring their calendars to the Conference for scheduling purposes, and the parties should be prepared to revisit settlement.

**At least three (3) business days in advance of the Conference, counsel for each side shall submit a position letter, setting forth their party's settlement posture**. To ensure candor, the position letters are not to be filed nor shared with opposing counsel, but rather faxed

directly to this Court's Chambers at (412) 208-7467.  All position letters will be kept **confidential**.  **Counsel and their clients, or persons with full settlement authority MUST BE PRESENT at the Conference**.  A person with full settlement authority is not someone who is required to consult with other individuals, by telephone or otherwise, to obtain approval for any proposed settlement term or amount.  The Court will not entertain requests for telephone participation.

       IT IS SO ORDERED.


December 23, 2014                                             s\Cathy Bissoon
                                                                   Cathy Bissoon
                                                                   United States District Judge


cc (via ECF email notification):

All Counsel of Record